**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  SEAN MICHAEL O'BRIEN
    and NICOLE MARIE O'BRIEN,            Chapter 13
                                   Case No. 03-17448 (RTL)

         Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - -X

SEAN MICHAEL O'BRIEN and
  NICOLE MARIE O'BRIEN,

                               Adversary Proceeding
         Plaintiffs,         Case No.  08-1676 (RTL)

        v.

FREDERICK CLEVELAND,
CLEVELAND DEVELOPMENT, LLC.,
  and WILLIAM E. GAHWYLER,

         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

PINILISHALPERN, LLP
Gabriel H. Halpern, Esq.
Attorneys for Plaintiffs/Debtors

DUANE MORRIS LLP
Eric R. Breslin, Esq.
Gia G. Incardone, Esq.
Attorneys for Defendants Cleveland
    and Cleveland Development, LLC

WILLIAM E. GAHWYLER, Jr., Esq.
Pro Se

**RAYMOND T. LYONS, U.S.B.J.**

## INTRODUCTION

Plaintiffs accuse the Defendants of defrauding them through a mortgage foreclosure rescue scam.  On the eve of a sheriff's foreclosure sale, Plaintiffs deeded their house worth over $800,000 to Defendant Cleveland with an option to buy it back at $650,000.  Cleveland took out a new mortgage, paid off Plaintiffs' old mortgage and pocketed over $100,000.  He subsequently defaulted on his mortgage and the new lender commenced a second foreclosure action.

This mortgage rescue scam is fraudulent and is an unconscionable commercial practice in violation of New Jersey's Consumer Fraud Act.  Furthermore, the sale/leaseback is, in reality, a financing transaction subject to the Truth In Lending Act ("TILA") as amended by the Home Ownership and Equity Protection Act ("HOEPA") as well as the New Jersey Home Ownership Security Act of 2002 ("HOSA").  Since Defendant Cleveland failed to comply with each of these consumer protection statutes, he is liable for the remedies allowed thereunder.

Defendant Gahwyler, an attorney at law, violated certain ethical obligations and conspired with Cleveland in his wrongdoings.  Gahwyler is jointly liable for all damages and statutory remedies.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising in or related to a case under Title 11 of the United States Code to the bankruptcy court.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(D) (obtaining credit), (M) (use or lease of property) (N) (sale of property) and (O) (other proceedings affecting the liquidation of assets of the estate).

2

## FINDINGS OF FACT AND PROCEDURAL HISTORY

Sean and Nicole O'Brien (Plaintiffs/Debtors) filed a chapter 13 bankruptcy on March 7, 2003 in an attempt to save their home from foreclosure. The O'Briens had fallen behind on their mortgages after Mr. O'Brien was laid off from his job. Both lenders had started foreclosure actions in state court. The O'Briens' chapter 13 plan proposed to cure the arrears and remain current on post petition payments on both mortgages. Some priority tax claims also had to be paid. The court confirmed the plan. Unfortunately, Mr. O'Brien's new job did not last. When they were unable to keep up the payments under their chapter 13 plan, on September 8, 2006, the first mortgagee received relief from the automatic stay to complete a mortgage foreclosure.

The O'Briens found a buyer for their house at a price of $808,000. The state court stayed the sheriff's sale to permit the sale to go through; however, the buyers backed out of the deal. The buyers offered a lower purchase price of $740,000 which the O'Briens refused. Faced with another deadline for sheriff's sale and being unqualified for conventional financing, the O'Briens found a lender for unconventional financing. Again, that deal fell through at the eleventh hour. The mortgage broker referred the O'Briens to Frederick Cleveland (Defendant) as someone who might be able to help them.

Mr. Cleveland came through with a written proposal by his company, Cleveland Development, LLC.[1] He would arrange financing to satisfy the existing mortgages on the property to save it from foreclosure:

> I am pleased to inform you that you have been pre-qualified for a
> mortgage solution <u>loan</u> in the amount of $540,000.00+ to secure your

---

[1] Cleveland Development, LLC is a defendant but the only evidence of that entity's involvement is this initial proposal. All transactions were undertaken by Mr. Cleveland in his own name. No relief will be awarded against Cleveland Development, LLC.

home from foreclosure.

This is not a commitment for a mortgage.  <u>A commitment will be issued</u> upon the receipt of an acceptable appraisal, sales contract and satisfactory verification of all additional information provided. Please feel free to contact me with an questions at my office [phone number redacted].

This process works as follows: We obtain an appraisal for the subject property and your current mortgage payoff balance.   Your current mortgage will than [sic] be satisfied.  A new title will be created with our company as the <u>lien holder</u> and an addendum with your name being attached stating that we cannot add any additional liens to this property or sell property why [sic] current lease is in good standing. After closing you will pay the current mortgage, taxes, and insurance through us at an amount ~~approximately $4500 to $6,000,*~~ *$5,000 (strike out and insertion by Mr. O'Brien) ~~or a sensible amount that you can afford free from financial hardship starting~~ 6 months after closing. After one year we will deed you back to first position on the current title and <u>you will assume the mortgage</u> or find your own financing if you wish. (Emphasis added.)

Further details of the proposal were somewhat hazy and were revealed piecemeal as the deadline for the sheriff's sale inexorably approached.  Mr. Cleveland explained orally, not in writing, that the O'Briens would have to transfer title to him, but they could continue to occupy the house and would pay him $5,000 per month.  By faithfully paying $5,000 per month for two years, the O'Briens would establish a track record to show a new lender they could afford the house.  They could then buy back the house for approximately $650,000.

The O'Briens accepted Mr. Cleveland's proposal.  He then filed a notice of settlement with the county clerk.  In the meantime, another foreclosure rescuer ("Rescuer #2") solicited the O'Briens with a deal they considered superior to Cleveland's.  The O'Briens signed a contract to sell their home to Rescuer #2 for $800,000.  They gave this contract to their bankruptcy lawyer who moved for approval of the sale before the bankruptcy court, which was granted.  However,

because Mr. Cleveland had recorded a notice of settlement with the county clerk, the O'Briens could not convey clear title, so they abandoned this transaction and resorted to Mr. Cleveland's deal. No one informed the bankruptcy court or the trustee that the approved sale was not consummated.

The O'Briens are not typical victims. On the contrary, Mr. O'Brien is a sophisticated, educated and experienced business person. He has a bachelor's degree in accounting and has worked at a variety of sales and marketing jobs earning a six-figure income. Mrs. O'Brien is a college graduate and teaches school. She relied on her husband to handle the financial affairs. Mr. O'Brien understands the deal as slowly revealed to him by Mr. Cleveland. He agreed to the deal as explained because he had no other choice. The state court had granted him multiple extensions of time, but had fixed a final deadline. It was either Mr. Cleveland's deal or the street.

What Mr. Cleveland did not explain, and what Mr. O'Brien did not anticipate, was that Cleveland would mortgage the property for $646,400, not merely the $510,000 needed to satisfy O'Briens' mortgages. Nor did the parties discuss servicing Cleveland's new mortgage during the rental period. Mr. O'Brien assumed that his $5,000 monthly payment was servicing the financing. He did not fully appreciate that Mr. Cleveland would have to make monthly payments to a new lender ("New Lender"), and if Mr. Cleveland failed to do so the O'Briens could lose their home even if they faithfully paid the $5,000 per month to Cleveland. Mr. Cleveland prepared three documents that were signed: (1) a Standard Real Estate Purchase And Sale Agreement between Mr. Cleveland as Buyer and Mr. O'Brien as Seller for a price of $555,232; (2) A Lease Agreement Buyback between Mr. Cleveland as Landlord and Mr.

O'Brien as Tenant/Original Seller/Original Selling Tenant showing a monthly rental of $5,000

and a Buy Back price of $650,483.83; and (3) another Standard Real Estate Purchase And Sale

Agreement with Mr. Cleveland as Seller for a price of $650,483.83.  None of these written

documents accurately describes the agreements between the O'Briens and Mr. Cleveland.  Many

of the boiler plate provisions are blatantly inconsistent with the understanding of the parties; for

example, there is a provision in the purchase agreement giving Mr. Cleveland the right to

possession on closing when the parties agreed that the O'Briens would remain in possession.

However, one unusual provision in the Lease Agreement Buyback is notable.  The O'Briens are

given the right to cancel the lease at any time upon thirty days notice "at which time property

will be sold and sales proceeds less any cost will be disbursed to original selling tenant."  In

other words, if the O'Briens decided to leave the house, it would be sold and they would get the

net proceeds.

As the sheriff's gavel was poised to fall, the parties gathered at the law office of William

E. Gahwyler, Jr., Cleveland's lawyer.  Mr. Gahwyler prepared all the closing documents

including the deed and affidavit of title for the O'Briens to sign.  The closing statement (RESPA

HUD-1) misrepresented the sales price as $808,000 and showed the buyer, Mr. Cleveland, as

investing $187,978.91 in cash.  Actually, he did not invest any cash; to the contrary, he withdrew

over $100,000 from the closing proceeds.  The closing statement also showed that after

satisfying all liens on the property, the O'Briens were to receive $287,516.17 in cash.  This, too,

was a misrepresentation.  Their deal with Mr. Cleveland would not have yielded any cash to

them (except to pay off their bankruptcy, as explained below).  For some unexplained reason,

Mr. Gahwyler wrote a check to the O'Briens for $15,000 from his attorney trust account.

6

Mr. Gahwyler's attorney trust account ledger shows he received a total of $645,227.50[2]

from the new lender and no other funds.  He disbursed that money as follows:

A.  <u>To or for the benefit of O'Briens</u>

| | |
|---|---:|
| O'Briens | $15,000.00 |
| Satisfy First Mortgage | 414,748.22 |
| Foreclosure Attorney Fees & Costs | 10,781.88 |
| Satisfy Second Mortgage | 85,434.51 |
| Record Discharges of Two Mortgages | 40.00 |
| Third quarter real estate taxes | <u>3,603.90</u> |
| **TOTAL** | **$529,608.51** |

B.  <u>To or for the benefit of Cleveland</u>

| | |
|---|---:|
| Cleveland | $84,539.19 |
| Cleveland | 1,167.00 |
| NJ Employment Security (Cleveland's | 11,980.50 |
| Funding Solutions - mortgage broker | <u>6,464.00</u> |
| **TOTAL** | **$104,150.69** |

C.  <u>Costs and Fees</u>

| | |
|---|---:|
| Title Insurance | $1,016.01 |
| Recording fees | 250.00 |
| Realty Transfer fee | 7,389.80 |
| <u>Gahwyler legal fees</u> | <u>2,812.49</u> |
| **TOTAL** | **$11,468.30** |
| **GRAND TOTAL** | **$645,227.50** |

---

[2]  The new loan amount shown on the closing statement is $646,400.00.  The New Lender withheld $1,172.50 in fees and interest and disbursed a net of $645,227.50 to Mr. Gahwyler as closing agent.

Prior to closing, Mr. O'Brien informed Mr. Cleveland that he and his wife had a pending chapter 13 case.  In addition to curing the arrears on their mortgages, their plan called for payment of priority taxes and administration expenses.  Mr. O'Brien explained that he wanted to pay off the balance due on his plan so his bankruptcy case could be closed.  He believed this would be important in restoring his creditworthiness.  The balance due on his plan was approximately $46,000.  Mr. Cleveland agreed to pay the balance due to the chapter 13 trustee.

At the closing, Mr. Gahwyler informed the parties that the title search did not show an open bankruptcy case for the O'Briens.  Mr. O'Brien insisted that a balance was due to the trustee.  Mr. Gahwyler placed a call to his title abstract company and received confirmation that they showed no pending bankruptcy.  To placate Mr. O'Brien, Mr. Cleveland signed a written promise to pay up to $46,000 to satisfy the balance due on a chapter 13 plan if indeed Mr. O'Brien proved correct.

Following closing, Mr. O'Brien contacted the chapter 13 trustee and verified that more than $46,000 was needed to complete his plan.  He requested the money from Mr. Cleveland, but no payment was forthcoming.  Mr. O'Brien contacted his bankruptcy attorney who brought a proceeding to force Mr. Cleveland and Mr. Gahwyler to come up with the money.  At the hearing in bankruptcy court, the trustee pointed out many discrepancies and questionable aspects of the O'Brien/Cleveland transaction.  Among them were:

1.  The court had approved a sale of the residence by the O'Briens to Rescuer #2 for a price of $808,000.

2.  The O'Brien/Cleveland transaction had never been brought before the bankruptcy

court.[3]

3.  The HUD-1 closing statement showed the O'Briens receiving $287,516.17 in closing

proceeds, when they claimed to have received none.

The court denied any relief because an adversary proceeding would be required to obtain

personal jurisdiction over the respondents.  That spawned the instant adversary proceeding.

In the interim, the O'Briens paid $5,000 per month to Mr. Cleveland.  He paid the New

Lender for several months, but eventually defaulted.  The New Lender initiated foreclosure

proceedings in state court.  Mr. Cleveland failed to answer the foreclosure complaint.

The O'Briens joined the New Lender as a defendant in this adversary proceeding but

agreed to dismiss the complaint against the New Lender.  A consent order was entered under

which the New Lender has agreed to accept monthly payments from the O'Briens.  Even though

the payments increased to $6,800 per month, the O'Briens were able to stay current until a few

months prior to trial.

Plaintiffs called an attorney as an expert witness regarding the alleged malpractice by Mr.

Gahwyler and to explain mortgage foreclosure rescue scams.  Defendants objected to the

expert's testifying on a variety of grounds, including bias, since he represented another party

suing the same defendants in state court.  The court permitted the testimony, but after hearing it,

determined that the expert's opinions will not assist the court as the trier of facts.  Therefore, the

court has disregarded the expert's testimony.

After offering a few documents into evidence without objection, the Defendants rested

without testifying or calling any witnesses.

_____

[3]  The trustee has not sought to intervene in this adversary proceeding and has not yet sought to avoid the
transaction under 11 U.S.C. § 549(a).

9

## DISCUSSION

The Plaintiffs seek damages and equitable relief for fraud and violation of various state and federal consumer protection statutes. Plaintiffs also seek an award of damages against Mr. Gahwyler for legal malpractice and conspiracy.

### I. *Fraud*

The New Jersey Supreme Court has defined fraud as follows:

> The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.

*Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997) (citation omitted). Failure to disclose information where there is a duty to do so constitutes misrepresentation. *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 599 (3d Cir. 1972); *Berman v. Gurwicz*, 429 A.2d 1084, 1088 (N.J. Super. Ct. Ch. Div. 1981) ("Silence in the face of an obligation to speak may be fraud.").

In this case, Cleveland failed to disclose to the O'Briens that he was using their house as collateral to borrow almost $650,000 when only $510,000 was needed to satisfy the O'Briens' mortgages and stop the sheriff's sale. This enabled Cleveland to strip off over $100,000 of equity in the O'Briens' home for himself. Furthermore, Cleveland failed to disclose that the monthly payments on this new loan were $6,300, and later increased to $6,800 per month; substantially more than the $5,000 per month the O'Briens agreed to pay. Thus, the O'Briens' monthly payments were insufficient to fund the debt service on the new loan. Lastly, Cleveland

10

failed to inform the O'Briens that, in the event Cleveland did not make monthly payments, the new lender could foreclose even if the O'Briens were current on their monthly payments to him. This could lead to the loss of their home and the equity therein, just the outcome they desperately sought to avoid.

All of these undisclosed facts were material.  Cleveland knew these facts and intentionally concealed them from the O'Briens.  They reasonably relied on the facts that they knew as the only way to save their home, not realizing that Cleveland was enriching himself at their expense and that their home remained in grave danger of foreclosure in any event.  They have been damaged by the loss of title to their home and the increase in indebtedness encumbering the home.

Plaintiffs are entitled to a judgement voiding their deed to Cleveland and damages for the increased amount of debt encumbering their home - $116,791.49 (new mortgage $646,400 less amounts paid to or for the benefit of O'Briens $529,608.51).  The court will schedule a further hearing to consider punitive damages.

## II. _Consumer Fraud Act_

The New Jersey Consumer Fraud Act ("CFA") prohibits the use of any unconscionable commercial practice, deception or fraud.  N.J. STAT. ANN. § 56:8-2.  It applies to the provision of consumer credit.  _Lemelledo v. Beneficial Mgmt. Corp. of Am._, 696 A.2d 546, 551 (N.J. 1997). As remedial legislation the CFA is to be applied broadly to accomplish its clear legislative intent ("to root out consumer fraud").  _Id._  In particular, "the word 'unconscionable' must be interpreted liberally so as to effectuate the public purpose of the CFA." _Assoc. Home Equity Serv., Inc. v. Troup_, 778 A.2d 529, 543 (N.J. Super. Ct. App. Div. 2001).  "The standard of

11

conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971).

Defendant Cleveland argues that the CFA does not apply in this case because the O'Briens are sophisticated and "were not misled in any capacity." He claims that "no such deception, fraud or falsity occurred." There is no statutory exception for sophisticated consumers. Even the most sophisticated consumers are entitled to the protections of the CFA. Additionally, the terms - unconscionable commercial practice, deception, fraud and false promise - are used disjunctively so it is conceivable that a commercial practice might not be fraudulent or deceptive but would, nevertheless, be unconscionable. *State v. Hudson Furniture Co.*, 398 A.2d 900, 902 (N.J. Super. Ct. App. Div. 1979). In fact, the New Jersey legislature amended the CFA in 1971 to add "unconscionable commercial practice" to the prohibited acts evidencing a more expansive reach than fraud alone. 1971 N.J. Laws, ch. 247. "Violation of the act can be shown even though a consumer has not in fact been misled or deceived. It is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited." *Skeer v. EMK Motors, Inc.*, 455 A.2d 508, 511 (N.J. Super. Ct. App. Div. 1982); *Truex v. Ocean Dodge, Inc.*, 529 A.2d 1017, 1020 (N.J. Super. Ct. App. Div. 1987).

In this case, Mr. Cleveland structured a transaction whereby the O'Briens deeded their home, worth around $800,000, to him in exchange for only approximately $530,000. He immediately stripped out over $100,000 for himself and left the O'Briens at risk of losing their home and the remaining equity therein to himself or the New Lender. Cleveland encountered the O'Briens in an exceedingly vulnerable position. They were on the brink of a sheriff's sale of their home and had exhausted all efforts to save it in both state and federal court. Cleveland took

unfair advantage of the O'Briens predicament to enrich himself to the tune of $100,000 and

potentially much more.  The court finds that this is an unconscionable commercial practice in

violation of the CFA, entitling the O'Briens to the remedies provided thereunder.

Remedies for violation of the CFA include treble damages, reasonable attorneys' fees

and costs:

> Any person who suffers any ascertainable loss of moneys or
> property, real or personal, as a result of the use or employment by
> another person of any method, act, or practice declared unlawful
> under this act or the act hereby amended and supplemented may
> bring an action or assert a counterclaim therefor in any court of
> competent jurisdiction. In any action under this section the court
> shall, in addition to any other appropriate legal or equitable relief,
> award threefold the damages sustained by any person in interest. In
> all actions under this section, including those brought by the Attorney
> General, the court shall also award reasonable attorneys' fees, filing
> fees and reasonable costs of suit.

N.J. STAT. ANN. § 56:8-19.  The remedies are mandatory.  *Garcia v. General Motors Corp.*, 910

F.Supp. 160, 166 (D.N.J. 1995); *see also Skeer*, 455 A.2d at 510-14 (noting that when the

legislature uses the word "shall" a presumption arises that application is mandatory).  The

O'Briens have suffered an ascertainable loss because a new mortgage of $646,400 has been

placed on their home, whereas they only received $529,608.51 in consideration.  The difference

is $116,791.49, which trebled equal $350,374.47.  Plaintiffs will be awarded a judgment in that

amount and may submit proof of their attorneys' fees and costs.  Defendant Cleveland may

object to the amount of attorneys' fees and costs to the extent unreasonable.  Also, as other

appropriate equitable relief, the court will enter an order voiding the deed from the O'Briens to

13

Cleveland.

## III. *Equitable Mortgage*

In order for TILA, HOEPA or HOSA to apply, the Plaintiffs must first establish that the

sale and lease-back transaction constitutes consumer credit.[4] They attempt to do so by

categorizing the transaction as an equitable mortgage.

New Jersey courts of equity have long recognized the doctrine of equitable mortgage:

> The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done. To dedicate property, or to agree to do so, to a particular purpose or debt, is regarded in equity as creating an equitable lien thereon in favor of him for whom such dedication is made. This wholesome equitable principle is one of wide, if not universal, recognition and application.

> The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at the form. If an intent to give, charge, or pledge property, real or personal, as security for an obligation, appears, and the property or thing intended to be given, charged, or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course.

*Rutherford Nat. Bank v. H.R. Bogle & Co.*, 169 A. 180, 182 (N.J. Ch. 1933) (citations omitted);

*see also Humble Oil & Refining Co. v. Doerr*, 303 A.2d 898, 909 (N.J. Super. Ct. Ch. Div. 1973)

("It is clear that equity looks to substance rather than form, and that a guarantor or surety who

---

[4]*See* 1 HOWARD J. ALPERIN & ROLAND F. CHASE, CONSUMER LAW § 276 (1986) ("The Truth in Lending Act covers *credit* transactions, which may be either loans or installment sales."); NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING 667 (6th ed. 2007) ("[A] covered loan must be a 'consumer credit' transaction and must be secured by the consumer's principal dwelling.").

takes property or an interest therein as security for his guaranty is a mortgagee thereof in

equity."); *James Talcott, Inc. v. Roto Am. Corp.*, 302 A.2d 147, 157 (N.J. Super. Ct. Ch. Div.

1973) ("If a transaction resolves itself into a security, whatever may be its form and whatever

name the parties choose to give it, it is, in equity, a mortgage.").

Both parties cite to *Brown v. Grant Holding, LLC*, 394 F.Supp. 2d 1090 (D. Minn. 2005).

In *Brown*, the court applied a six-factor balancing test to determine whether a transaction similar

to the Cleveland/O'Brien transaction was an equitable mortgage or a sale and leaseback

agreement in light of a state law presumption that a deed is a conveyance.  394 F.Supp. 2d at

1097-99.  Similar to the law in New Jersey, Minnesota law is that, "[t]o create an equitable

mortgage, all circumstances must indicate that both parties intended the transaction to be a loan

advanced on security of realty."  *Id.* at 1097.  In order to determine intent, the courts looked at:

(1) the transaction documents and whether they used terms such as "debt," "security," or

"mortgage;" (2) the value of the property versus the loan amount; (3) the "nature of the

solicitation that gave rise to the transaction in question;" (4) whether the owner attempted to sell

the property on the open market; (5) whether the sale price was negotiated by the parties; and (6)

whether the foreclosee continued occupancy of the home after the transaction. *Id.* at 1097-99.

While the court in *Brown* determined, after weighing these factors, that the transaction in

question was not an equitable mortgage, this court finds that the intent of the parties in the

present case was to effectuate a loan, secured by the O'Briens' home.

Similar facts existed in *Essex Property Services, Inc. v. Wood*, 587 A.2d 1337 (N.J.

Super. Ct. Law Div. 1991), where the court deemed it "inescapable that originally the parties

contemplated that their transaction was a method of temporary refinancing and that both parties contemplated that defendants would 're-purchase' the property" and found that the "relationship of landlord and tenant was incidental to that mutual and dominant contemplation." 587 A.2d at 1339.  In *Essex Property,* the home-owners were facing foreclosure when approached by the rescuer who offered to buy the property and lease it back to them with an option to buy it back in one year.  *Id.* at 1338.  The court recognized that this determination is fact sensitive, but relied primarily on the "common intention expressed by the parties" to determine that the transaction represented an equitable mortgage and not a lease.  *Id.* at 1338-39.  Here, as in *Essex Property*, the admitted intent of the parties was to rescue the Plaintiffs from mortgage foreclosure, not that the Plaintiffs become tenants and be dispossessed of ownership of their home.  The court in *Essex Property* noted that the "transaction [was] far more complicated than a lease" and that "[a]lthough a lease was one of the documents, it was subordinate to the intention of the parties, rather than the motivation or dominant factor in the transaction."  *Id.* at 1339.  The same is true here.

The National Consumer Law Center ("NCLC") also recognizes that sale/lease-back transactions are potentially "thinly disguised loan[s]" often targeted at homeowners facing foreclosure.  NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING 48 (6th ed. 2007).  The NCLC describes a transaction similar to the O'Brien/Cleveland transaction:

> These transactions work like this: the homeowner "sells" the title to the real estate to a buyer/lender and receives in exchange a lease on the same premises, with an option to repurchase. . . .  The "rent" and repurchase arrangements cost the homeowner a great deal more than what he or she "sold" the property for, and the real

16

character of the transaction is simply a loan with interest hidden in the lease and repurchase arrangements.

Courts have long been willing to look behind such a transaction at the real intent and purpose to determine whether it is really an equitable mortgage to which state lending laws (particularly usury laws) apply. . . .  Where such transactions are really disguised loans, courts also have held that they were subject to Truth in Lending, including the rescission provisions.

In determining whether these transactions are sales or loans, courts have relied upon a variety of circumstances.  Factors that indicate than an absolute or conditional deed should instead be seen as an equitable mortgage include:

- Statements by the homeowner or representations by the purchaser indicating an intention that the homeowner continue ownership;

- A substantial disparity between the value received by the homeowner and the actual value of the property;

- Existence of an option to repurchase;

- The homeowner's continued possession of the property;

- The homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance;

- Disparity in bargaining power and sophistication, including the homeowner's lack of representation by counsel;

- Evidence showing an irregular purchase process, including the fact that the property  was not listed for sale or that the parties did not conduct an appraisal or investigate title; and

- Financial distress of the homeowner, including the imminence of foreclosure and prior unsuccessful attempts to obtain loans.

NATIONAL CONSUMER LAW CENTER, *supra*, at 48-49.

The factors that lead this court to conclude that the transaction in the present case is an

equitable mortgage are as follows:

(1) Cleveland Development's solicitation letter to the Plaintiffs contains the following

telling terminology:

- "[Y]ou have been pre-qualified for a mortgage solution **loan** . . . to secure your home from foreclosure."
- "This is not a commitment for a mortgage.  **A commitment will be issued** upon . . . ."
- "A new title will be created with our company as the **lien holder** . . . ."

(2) The "Lease Agreement Buyback" provides for sale proceeds to be disbursed to the

Plaintiff upon cancellation of the agreement.

(3) The property had a value of over $800,000; however, the Defendant "purchased" it

for only $555,232.

(4) The O'Briens have the option to repurchase their home for $650,483.83.

(5) The O'Briens were not represented by counsel in the transaction.

(6) The O'Briens were in financial distress.  Their attempts to save their home through

refinance or bankruptcy reorganization had failed as did their attempt to realize the equity

through sale.

(7) The Plaintiffs' intent was that this transaction was a loan, secured by their home.  Mr.

O'Brien testified on cross examination:

> Q:This is another version of the contract, is it not, with a different purchase price?
> A: It's not actually.  This is a contract that was given to me to repurchase the

18

home, so I already have a sale agreement to buy it back.

Q: So this was the agreement that would have been in place, had you bought it back in two years?

A: Correct, he was in essence already agreeing to sell it back.

Q: Okay.  And if you turn to the third page, and that was something you very much wanted, isn't that correct?

A: It was the only reason I was doing this, to stay in the home.

Q: That was the whole point, that your credit would get better and then you would eventually buy back the home.  That was your plan, correct?

A: Correct.

Mr. Cleveland did not testify; therefore, aside from the documents, there is no evidence of his intent or anything to contradict Mr. O'Brien's testimony that the transaction was meant to refinance the mortgage allowing him to keep his home.

**Unclean Hands**

Cleveland argues that the O'Briens come to this court with unclean hands and therefore should be denied equitable relief.  Defendant Cleveland contends that the Plaintiffs "perpetrated a fraud on this Court" when they pursued a motion to sell their property to Rescuer #2 while at the same time negotiating the present deal with him.  Mr. O'Brien testified that the couple was initially planning to sell their home but the buyer backed out.  They then pursued refinancing with another mortgage broker but that failed at the last minute.  After the O'Briens had verbally agreed to Cleveland's proposal, they signed a contract to sell their property to Rescuer #2.  It appeared to the O'Briens that Rescuer #2's deal was superior and they attempted to pursue it.  That contract was presented to the bankruptcy court and approved as an outright sale.  However, Cleveland had already filed a notice of settlement with the county clerk that impaired title; thus,

the O'Briens were forced to close with Cleveland.

The Supreme Court and the Third Circuit agree that it is not mandatory that the court apply the unclean hands doctrine. *See In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999). Furthermore, "[a]s an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court." *Id.*; *see also Precision Instrument Mfg. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) ("This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'").

The Plaintiffs here did not act with unclean hands. "Simply stated, 'clean hands' means good faith." *Castle v. Cohen*, 840 F.2d 173, 178 (3d Cir. 1988) (citations omitted). The district court in *Castle* stated this another way: "the clean hands doctrine is applicable when . . . a party seeking affirmative relief . . . is guilty of conduct involving fraud, deceit, unconscionability, or bad faith . . . ." 676 F.Supp. 620, 627 (E.D. Pa. 1987), *aff'd in part and remanded on other grounds*, 840 F.2d at 173. The Supreme Court deems unclean hands as those "tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument,* 324 U.S. at 814. The O'Briens' failure to fully inform the bankruptcy court, while regrettable, is nevertheless not the type of unconscionable conduct that should bar them from arguing for an equitable mortgage.

Furthermore, that which transpired between the O'Briens, Rescuer #2, and this court during the O'Briens bankruptcy case is unrelated to the O'Brien/Cleveland transaction and the

present adversary proceeding.  "A successful unclean hands defense to an injunction proceeding

requires a showing by defendant that plaintiff's conduct is inequitable and that it involves the

subject matter of the plaintiff's claim."  *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844,

855 (1984).  The Third Circuit has elaborated:

> [T]he primary principle guiding application of the unclean hands doctrine is
> that the alleged inequitable conduct must be connected, *i.e.,* have a
> relationship, to the matters before the court for resolution. We will not refuse
> relief to a party merely because it has engaged in misconduct which is
> unrelated to its claims before the court. Only when "some unconscionable act
> of one coming for relief has immediate and necessary relation to the equity
> that" the party seeks, will the doctrine bar recovery.

*New Valley*, 181 F.3d at 525 (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S.

240, 245 (1933)).  The Third Circuit provides an example of "sufficiently related" in *Monsanto*.

Here the court declared a Monsanto patent invalid after finding that Monsanto acted with

unclean hands by misrepresenting the properties of its product in order to obtain a patent.  456

F.2d at 599.  In *New Valley*, the court held that unclean hands did not prevent a creditor, who

continually supported and argued a falsity regarding an assignment of the debtor's lease, from

pursuing a valid claim against the debtor based on that lease, because the two were not

sufficiently related.  181 F.3d at 518.  Similar to the argument made by Cleveland, the district

court in *New Valley* based its finding of unclean hands on the theory that this result was

necessary to "protect the integrity of the court itself, regardless of whether the unclean hands of a

creditor injured a party and regardless of the presence of any immediate and necessary

relationship between the claims before the court and the events giving rise to the assertion of

unclean hands." *Id.* at 521-22.  This interpretation was rejected by the Third Circuit and the

district court's holding was reversed on appeal.  *Id.* at 524-25.  Whatever criticism one might

have of the O'Briens' communication with the bankruptcy court, it did not affect Cleveland.

Therefore, Defendant Cleveland cannot use what he deems a "fraud on the court" as a defense to

the court's finding of an equitable mortgage.

## IV. *The Truth in Lending Act (TILA)*

The Plaintiffs urge the court to apply the Truth in Lending Act ("TILA") and rescind the

transaction.  TILA is the commonly used name for Title I of the Consumer Credit Protection Act

of 1968 and is codified at 15 U.S.C. §§ 1601, *et seq.*  TILA was enacted to "protect the consumer

against inaccurate and unfair credit billing and credit card practices" by requiring lenders to

disclosure certain information.  15 U.S.C. § 1601(a).  TILA vests the Board of Governors

("Board") of the Federal Reserve System with the power to "prescribe regulations to carry out

the purpose of this subchapter."  15 U.S.C. § 1604(a).  The Board issued Regulation Z, 12 C.F.R.

§ 226, and when analyzing consumer lending issues, both the Act and Regulation Z must be read

together.  15 U.S.C. § 1602(y) ("Any reference to any requirement imposed under this

subchapter or any provision thereof includes reference to the regulations of the Board under this

subchapter or the provision thereof in question.").

TILA requires its prescribed disclosures to be made by any creditor to "the person who is

obligated on a . . . consumer credit transaction."  15 U.S.C. § 1631(a).  Cleveland argues that

TILA does not apply because he is not a creditor for purposes of TILA, referring only to the

portion of the definition of creditor that suits his argument.[5]  Creditor is defined within TILA to

include "[a]ny person who originates 2 or more mortgages referred to in subsection (aa) of this

section in any 12-month period."  15 U.S.C. § 1602(f).  Subsection (aa) refers to:

> [A] consumer credit transaction that is secured by the consumer's principal
> dwelling . . . if (A) the annual percentage rate at consummation of the
> transaction will exceed by more than 10 percentage points the yield on
> Treasury securities having comparable periods of maturity on the fifteenth
> day of the month immediately preceding the month in which the application
> for the extension of credit is received by the creditor; or (B) the total points
> and fees payable by the consumer at or before closing will exceed the greater
> of – (i) 8 percent of the total loan amount; or (ii) $400.

15 U.S.C. § 1602(aa); *see also* 12 C.F.R. § 226.2(a)(17), 226.32.

The Plaintiffs here argue that the O'Brien/Cleveland transaction was a high interest loan

defined in subsection (aa) of the statute.  According to the Plaintiffs' calculations, the interest

rate was "tantamount to 227% . . . in a one year period."  Plaintiffs base this argument on the

buyback price being equivalent to a balloon interest payment.  Therefore, if the O'Briens were to

exercise their option to repurchase one day after closing, which was permissible under the

agreement, they would be paying approximately $95,000 in interest in a short period of time.

The court has undertaken its own calculations and finds that the "annual percentage rate

at consummation" was approximately 20%.  To determine the annual percentage rate ("APR"),

one must first determine the "amount financed" and the "finance charge."  According to

---

[5] The definition of creditor begins with a two part test.  First, in order to be considered a creditor, a lender
must "regularly extend[] . . . consumer credit which is payable by agreement in more than four installments or for
which the payment of a finance charge is or may be required."  15 U.S.C. § 1602(f).  Cleveland argues that he is not
a creditor because he does not regularly extend credit.  The definition goes on to include HOEPA transaction
lenders, which Cleveland does not address in his brief.

Regulation Z, the amount financed is calculated by:

> (1) Determining the principal loan amount or the cash price (subtracting any downpayment);
> (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
> (3) Subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b).  In the instant case the amount financed was $529,608.51 (the amount required to satisfy the O'Brien's two mortgages, outstanding taxes, attorneys' fees of one of the lenders and the $15,000 the O'Briens received at closing).  "Finance charge" is defined in Regulation Z as:

> [T]he cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.  It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 226.4(a).  Here, the finance charge was approximately $240,875.32.  This includes the amount of the balloon interest payment upon buyback ($120,875.32), which was calculated by subtracting the loan amount ($529,608.51) from the buyback price ($650,483.83), plus monthly payments of $5,000 for two years ($120,000).

Using these figures the court estimates the APR in this transaction to be approximately 20%.  The yield on two year Treasury securities as of May 15, 2007 was 4.75%[6] (the "application for the extension of credit" was presumably received by the O'Briens sometime in June 2007).  Twenty percent "exceed[s] by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity."  This is the type of loan defined in Section

---

[6]Available at http://www.ustreas.gov.

1602(aa) and therefore Mr. Cleveland is a creditor under TILA.

Additionally, Mr. Cleveland is a creditor under TILA because the "total points and fees payable by the consumer at or before loan closing" exceed the statutory maximum.  *See* 15 U.S.C. § 1602(aa); 12 C.F.R. § 226.32(a).  Cleveland walked away from the closing with over $100,000.  The O'Briens "sold" the house to Cleveland for $529,608.51 and Cleveland mortgaged the property for $646,400.  Whether the Defendant classifies this personal gain as a finance charge, compensation, a real-estate related fee, or, as the facts indicate, he did not disclose it all, the $100,000 payment satisfies subsection (B) of the definition of creditor under Section 1602(aa).  *See Durham v. Loan Store, Inc.*, No. 04C6627, 2006 WL 3422183, at *5 (N.D. Ill. 2006) (implying that money "siphoned" from the borrower at closing is included in points and fees calculations).

Furthermore, there is sufficient evidence that Cleveland originated at least two mortgages of the type specified in 15 U.S.C. § 1602(aa).  The Plaintiffs entered into evidence the HUD-1 statement, the deed and the leaseback agreement pertaining to another borrower ("Borrower"). Similar to the O'Brien transaction, the loan amount in the Borrower's transaction appears to have been significantly less than the buy-back price and less than the number represented on the deed.  There also exists a leaseback agreement with payments of $2,000 per month for one year, at which time, the Borrower could buy back the property for more than he "sold" it for. Cleveland's lawyer, Gahwyler, represented him on the transaction with the Borrower as well. Mr. Gahwyler testified at his deposition that the transaction between Cleveland and the Borrower was similar to the O'Brien transaction; i.e., a sale/leaseback to save a home from a

foreclosure sale.

It is also noteworthy that the disclosure requirements of TILA do not consider the sophistication of the borrower, as Cleveland also argued in his brief.  Although initially enacted to benefit minorities who were being denied traditional financing, it offers blanket protection against "victimiz[ation] . . . by second mortgage lenders, home improvement contractors, finance companies, and banks who peddle high-rate, high-fee home equity loans to cash-poor homeowners."  H.R. REP. NO. 103-652, at 1987-88 (1994) (Conf. Rep.).  Congress recognized that "these loan structures are potentially dangerous when misused and warrant a heightened degree of consumer protection in order to ensure that borrowers are not victimized by abusive lending practices."  *Id.*  Therefore, even the most sophisticated borrower is entitled to the disclosures.

**Disclosure Requirements & Prohibited Terms**

Defendant Cleveland is a creditor under TILA and was therefore required to make the traditional TILA disclosures.  Furthermore, because the Defendant is a creditor pursuant to Section 1602(aa), he is also required to make the enhanced disclosures required by the Home Ownership and Equity Protection Act ("HOEPA").  15 U.S.C. § 1639 (added to TILA in 1994); *see also* 12 C.F.R. §§ 226.31, 226.32, 336.34 (incorporating HOEPA into Regulation Z).  The Plaintiffs claim that they did not receive any TILA or HOEPA disclosures and the Defendant concedes this fact.

HOEPA also lists several prohibited terms and "[a]ny mortgage that contains a provision prohibited by [Section 1639] shall be deemed a failure to deliver the material disclosures

26

required . . . ."  15 U.S.C. § 1639(c)-(j); *see also* 12 C.F.R. § 226.32.  Balloon payments on

mortgages of less than five years are prohibited.  15 U.S.C. § 1639(e); 12 C.F.R. § 226.32(d)(1).

A balloon payment exists when the regular payments do not fully amortize the outstanding

principal balance.  *Id.*  The repayment structure set forth by the Lease Agreement Buyback gives

rise to a balloon interest payment and therefore the term is among those prohibited by HOEPA.

     None of the discloses required by TILA and HOEPA were made to the O'Briens by Mr.

Cleveland or anyone else.  Mr. Cleveland, being a creditor under TILA and HOEPA, was

required to provide the disclosures.  He was also required to comply with TILA and HOEPA's

prohibition of terms, which he did not.  Therefore, the Plaintiffs are entitled to the remedies

provided for by the statute.

**Damages**

     Upon violation of the Truth in Lending Act, Section 1640 authorizes: (1) actual damages

that resulted from the creditor's failure to make the disclosures; (2) statutory damages equal to

double the finance charge but not more than $2,000 or less than $200; and (3) costs and

reasonable attorneys' fees (if action is successful).  15 U.S.C. § 1640(a)(1) - (3).  Upon violation

of HOEPA, the consumer is also entitled to "an amount equal to the sum of all finance charges

and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not

material."  15 U.S.C. § 1640(a)(4).

     A majority of courts have held that in order to receive actual damages a plaintiff must

prove detrimental reliance.  *See* NATIONAL CONSUMER LAW CENTER, *supra*, at § 8.5.3.  The

Third Circuit has not specifically addressed the issue as applied to TILA and the test for

detrimental reliance varies among the courts. *See, e.g., Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001) (requiring the borrower to prove a "causal link between the financing institution's noncompliance and his damages."); *Peters v. Jim Lupient Oldsmobile Co.*, 220 F.3d 915, 917 (8th Cir. 2000) (requiring that the borrower have read and understood the disclosures, and, had the disclosures been accurate, would have sought and obtained financing elsewhere); *Ephraim v. eHomeCredit Corp.*, No. 3:04CV2337, 2006 WL 648066, at *5 (M.D. Pa. Mar. 13, 2006) (finding detrimental reliance in a truth in lending case when the borrowers relied on the lender's representations that the transaction was beneficial to them, and as a direct result of this, suffered financial harm including a loss of equity and an over-secured mortgage); *Cannon v. Cherry Hill Toyota, Inc.*, 161 F.Supp. 2d 362, 369 (D.N.J. 2001) (applying *Peters* test). Plaintiffs' actual damages amount to the equity stolen from their property. This figure was included in the court's calculation of "fees" and therefore is also recoverable under Section 1640(a)(4). Thus, the court need not delve in to a complicated analysis of actual damages.

The finance charges and fees associated with this transaction equal approximately $240,875.32. Additionally, the Plaintiffs are entitled to statutory damages of $2,000 (the maximum amount allowed under the statute) and reasonable attorneys' fees and costs. 15 U.S.C. § 1640(a)(1) - (3).

**Rescission**

TILA also provides for the right of rescission under certain circumstances:

> [I]n the case of any consumer credit transaction . . . in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling

28

> of the person to whom credit is extended, the obligor shall have the right to rescind the transaction . . . .

15 U.S.C. § 1635(a); *see also* 12 C.F.R. § 226.23.  As concluded above, this transaction represents an equitable mortgage under New Jersey law and therefore a security interest was retained by Cleveland in the O'Briens' property.  Generally, the right to rescind spans three days; however, if the required disclosures regarding rescission (or other material disclosures) are not made, the clock does not start running and the obligor has up to three years to rescind the transaction.  15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3); *see also Busse v. Homebank LLC*, No. 2:07CV03495, 2009 WL 424278, at *5 (D.N.J. Feb. 18, 2009).  Because no such disclosures were made here, the O'Briens still have an opportunity to rescind the loan transaction executed with Mr. Cleveland.

The process of rescission begins with notice to the creditor.  15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(2).  The filing of a complaint for rescission is sufficient notice.  *Jones v. Saxon Mortgage, Inc.*, 161 F.3d 2 (table), 1998 WL 614150 at *4 (4th Cir. Sept. 9, 1998); *Taylor v. Domestic Remodeling, Inc.*, 97 F.3d 96, 99-100 (5th Cir. 1996); *see also Invengineering, Inc. V. Foregger Co.*, 293 F.2d 201, 203-04 (3d Cir. 1961) (focusing on intent to rescind).  Upon rescission, the security interest given by the borrower is terminated.  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(1).  To accomplish this the court will enter an order voiding the deed from the O'Briens to Cleveland.  Within twenty days of the creditor's receipt of the notice, the creditor must return to the borrower all money paid to it in connection with the transaction.  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(2).  If the creditor contests the borrower's right to

rescind, it should seek a declaratory judgment before the twenty day time period has elapsed.

*See* NATIONAL CONSUMER LAW CENTER, *supra*, at 445 (statute offers clear solution).  If no

action is taken within twenty days of the creditor's receipt of the rescission notice, the borrower

may retain the money or property without any further obligation.  15 U.S.C. § 1635(b); 12

C.F.R. § 226.23(d)(3).  If the creditor does comply with the rescission, the borrower must then

tender the money or property to the creditor.  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3).

The courts have the equitable authority to modify the parties' obligations.  12 C.F.R. §

226.23(d)(4) ("The procedures outlined in paragraphs (d) (2) and (3) of this section may be

modified by court order.").  The creditor's conduct may be taken into consideration.  *See Elsner*

*v. Albrecht*, 460 N.W.2d 232, 234-35 (Mich. Ct. App. 1990) (holding that trial court did not

abuse its discretion when ordering rescission without restitution to a bad-faith creditor); *Ralls v.*

*Bank of New York (In re Ralls)*, 230 B.R. 508, 523 (Bankr. E.D. Pa. 1999) (recognizing that

TILA allows for harsh remedies when creditor demonstrates deceptive conduct); NATIONAL

CONSUMER LAW CENTER, *supra*, at 461 ("HOEPA violations, a pattern of targeting vulnerable

individuals, and involvement with fraudulent home improvement contractors should also be

factors.").  In the case at hand, Mr. Cleveland never actually loaned any money to the O'Briens.

He took title to their house and mortgaged the property to obtain the money.  The equitable

result regarding steps two and three of the rescission process is to order Mr. Cleveland to comply

with step 2 by returning all the monthly payments and finance charges that the O'Briens have

paid to him in the course of this transaction, while not requiring the O'Briens to return the loan

amount to Cleveland.  The O'Briens are left to deal directly with the New Lender, the holder of

30

the mortgage, to service the loan obtained by Mr. Cleveland, secured by their home.

### V. _Home Ownership Security Act (HOSA)_

The New Jersey Home Ownership Security Act of 2002 ("HOSA"), N.J. STAT. ANN. §
46:10B-22, _et seq.,_ was adopted to address certain abusive mortgage lending practices.  Baher
Azmy & David Reiss, _Modeling a Response to Predatory Lending: The New Jersey Home
Ownership Security Act of 2002_, 35 RUTGERS L.J. 645, 648-50 (2004).  Plaintiffs' argue that if
the court finds that there is a violation of HOEPA, there is likewise a violation of HOSA .
Defendant Cleveland counters that he is not a predatory lender because the O'Briens are
sophisticated borrowers.  Neither party has analyzed the statute to address its applicability to this
case.

HOSA, as amended in 2004, regulates "home loans" and "high-cost home loans."  High-
cost home loans are limited to those where the principal amount is less than $350,000, adjusted
for inflation.  N.J. STAT. ANN. § 46:10B-24.  In this case, the principal amount was in excess of
$500,000 so this transaction is not a high-cost home loan as defined by HOSA.  However, the act
prohibits certain practices for all home loans, such as financing credit insurance, encouraging
default or charging excessive late fees.  N.J. STAT. ANN. § 46:10B-25.  Late fees may not exceed
5% of the past due payment and may be imposed only if a payment is fifteen days or more past
due.  N.J. STAT. ANN. § 46:10B-25(d).

The Lease Agreement Buyback permits Mr. Cleveland to assess a late fee if the $5,000
monthly payment is more than five days late at the rate of $10 per day.  Thus, if a payment is
more than twenty-five days past due, the late fee would exceed 5%.  Both the five day period and

31

the daily charge are prohibited by HOSA for any home loan.

Remedies for a material violation of HOSA include:

1. Statutory damages equal to the finance charges plus up to 10% of the amount financed,

2. Punative damages, and

3. Costs and attorneys' fees.

N.J. STAT. ANN. § 46:10B-29(b)(1).  The court finds that the excessive late fees provided under

the Lease Buyback Agreement constitute a material violation of HOSA.  Plaintiffs are entitled to

statutory damages equal to the finance charges.  Here the finance charges are $240,875.32 - the

sum of $5,000 per month for twenty-four months ($120,000) plus the difference between the

repurchase price ($650,483.83) and the amount financed ($529,608.51), i.e., $120,875.32.  In

addition, statutory damages include 10% of the amount financed, i.e., $52,960.85.  Total

statutory damages of $293,836.17 will be awarded to Plaintiffs under HOSA.  Plaintiffs may

submit proof of attorneys' fees and costs to which Defendant may object.  In addition, the court

will schedule an evidentiary hearing to consider punitive damages.

## VI. _Attorney Malpractice_

The O'Briens sued Mr. Gahwyler for legal malpractice.  Their complaint alleges:

> As the attorney representing Frederick Cleveland and as the settlement agent
> for the mortgage, Defendant William E. Gahwyler, Jr. breached the attendant
> standard of care due to a third party, committed conspiracy to defraud, and
> at the very least was negligent in his representation, and thereby engaged in
> professional malpractice (legal).

In their brief, the O'Briens point to the HUD closing statement showing that Gahwyler charged

them $900 for legal fees and claim that Gahwyler "improperly handled both sides of this

transaction."  In his answer, Gahwyler merely denied all allegations of the complaint related to

him and asserted as an affirmative defense, "This Defendant denies owing any duty to the

plaintiff."   Gahwyler did not testify at trial but the transcript of his deposition was admitted into

evidence without objection.  He testified that no attorney represented the O'Briens but that he

had prepared the deed, affidavit of title and other seller's closing documents for them.  He

admitted that he charged legal fees to both Cleveland and the O'Briens and testified, "I was

doing the buyer's and the seller's side, absolutely."

Gahwyler moved to dismiss this adversary proceeding for failure of Plaintiffs to comply

with the Affidavit of Merit statute.  N.J. STAT. ANN. § 2A:53A-27.  The court denied the motion

because it was not made until the eve of trial and by that time Plaintiffs had filed and served their

expert's report.

The elements of a claim for legal malpractice are: (1) an attorney-client relationship, thus

giving rise to a duty of care; (2) breach of that duty of care; and (3) damages proximately caused

by the breach.  *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1070 (N.J. 1996)*; DeAngelis v.

Rose*, 727 A.2d 61, 67 (N.J. Super. Ct. App. Div. 1999).  Liability for damages for attorneys

licensed in New Jersey is statutory as well.  N.J. STAT. ANN. § 2A:13-4; *Dixon Ticonderoga Co.

v. Estate of O'Connor*, 248 F.3d 151, 162 (3d Cir. 2001).  An attorney-client relationship

ordinarily requires mutual consent whereby the client seeks legal advice and the lawyer accepts

responsibility.  *In re Palmieri*, 385 A.2d 856, 859 (N.J. 1978); *Albright v. Burns*, 503 A.2d 386,

389 (N.J. Super Ct. App. Div. 1986).

In the main bankruptcy case before this adversary proceeding was commenced, Mr.

33

O'Brien certified that he was not represented by counsel at closing.  At trial he testified that he did not consider Mr. Gahwyler as his attorney and never sought advice from Mr. Gahwyler.  Mr. O'Brien did not realize that Mr. Gahwyler had charged the sellers $900 for legal fees.  Based on these facts the court finds no attorney-client relationship existed between the O'Briens and Mr. Gahwyler; therefore, an element of a standard legal malpractice claim is missing.

Under certain circumstances, an attorney may be liable to a non-client.  *Petrillo v. Bachenberg*, 655 A.2d 1354, 1357 (N.J. 1995) (typically courts limit a lawyer's duty to situations where the lawyer should have foreseen that the third party would rely on the lawyer's work).  An attorney also has an ethical obligation to refrain from participating in an illegal or fraudulent transaction.  *In re Labendz*, 471 A.2d 21, 21 (N.J. 1984).

The court has found that the mortgage foreclosure rescue transaction as structured by Cleveland was fraudulent under the common law, an unconscionable commercial practice under the Consumer Fraud Act and violated the Federal Truth in Lending Act and the New Jersey Home Ownership Security Act of 2002.  Mr. Gahwyler should have withdrawn from representing Mr. Cleveland as soon as the nature of the transaction became known to him.  Without Mr. Gahwyler's legal services, Cleveland's scam would have failed because the New Lender required an attorney to act as settlement agent.

In addition, Mr. Gahwyler prepared the HUD closing statement that misrepresented the purchase price at $808,000 and the investment by Cleveland of $187,978.91.  He testified at his deposition that he forwarded the closing statement to the New Lender and realized that the New Lender relied on its accuracy in funding the new loan to Cleveland.  As an attorney, Mr.

34

Gahwyler had an ethical obligation to prepare an accurate closing statement and should have

withdrawn from representing Cleveland rather than create an inaccurate closing statement. *Id.*

N.J. RULES OF PROF'L CONDUCT R. 1.16, 4.1 (2010).  Once again, had Gahwyler fulfilled his

ethical responsibilities, Cleveland could not have carried out his plot.  Gahwyler's failure to

perform his ethical obligations proximately caused damages to the O'Briens in the amount of the

increased debt encumbering this house.  They are entitled to a judgment against Mr. Gahwyler

for $116,791.49.

### VII. <u>Conspiracy</u>

Plaintiffs ask that Gahwyler be held liable in civil conspiracy.  Under New Jersey law an

attorney may be liable for damages if he assists a client in violating a law or committing a

wrongful act.  *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) ("In New Jersey,

a civil conspiracy is 'a combination of two or more persons acting in concert to commit an

unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an

agreement between the parties to inflict a wrong against or injury upon another, and an overt act

that results in damage.'").  Civil conspirators are jointly liable for the underlying wrong and the

resulting damages.  *Id.*

Here, Cleveland could not have violated the state and federal statutes meant to protect

consumers without Gahwyler's complicity.  Mr. Gahwyler knew or should have known that

Cleveland's scheme was wrong.  He is jointly liable for all damages.

### VIII.  <u>Conversion, Breach of Fiduciary Duty, Criminal Usury, Illegal Contract</u>

The complaint asserts that the Defendants converted Plaintiffs' property and breached an

unspecified fiduciary duty.  Their post trial brief does not address these causes of action and no

proofs were presented at trial.  No relief will be granted to Plaintiffs on their conversion or

breach of fiduciary duty counts.

Plaintiffs' pre-trial brief raises for the first time the allegation that this transaction

violates the state criminal usury law. N.J. STAT. ANN. §2C:21-19.  By Plaintiffs' calculation the

annual interest rate could be as high as 227% .  Charging interest over 30% per annum is a

crime.  They ask the court to treat their contract with Cleveland as illegal and refuse to enforce

it.  As a remedy they seek a return of their property and damages.  This theory was not plead in

the complaint and the court will not grant any relief based on the alleged violation of the state

criminal usury statute.

## IX.  *Breach of Contract*

At closing the parties signed a document wherein Cleveland promised to pay up to

$46,000 if needed to complete the O'Briens' chapter 13 plan.  The Standing Chapter 13

Trustee's report shows a balance due on their plan of more than $46,000 to satisfy priority tax

claims and administration expenses.  Upon payment of that amount the O'Briens will have

completed their chapter 13 plan and will be entitled to a discharge under 11 U.S.C. § 1328(a).

Cleveland failed to pay the $46,000 after the O'Briens demanded payment.  Plaintiffs are

entitled to judgement for damages in the amount of $46,000 plus prejudgment interest.

## CONCLUSION

Defendant Cleveland defrauded Plantiffs, the O'Briens, by failing to disclose that he

36

would be stripping off $100,000 of the equity in their home for his own benefit while leaving them in jeopardy of foreclosure.  They are entitled to damages.  His actions also constitute an unconscionable commercial practice under the New Jersey Consumer Fraud Act (CFA), N.J. STAT. ANN §56:8-1, *et seq.*, entitling Plaintiffs to treble damages, attorneys' fees and an order voiding the deed.  Moreover, the sale/leaseback transaction is, in reality, a financing transaction intended by the O'Briens to keep them in their home, not sell it.  As such, it comes within the consumer credit protection laws adopted by the state and federal government.

Cleveland failed to make the disclosures required under the Truth In Lending Act (TILA), 15 U.S.C. § 1601, *et seq.*, and the Home Ownership and Equity Protection Act (HOEPA) amendments to TILA, 15 U.S.C. § 1639.  The transaction also included a prohibited balloon payment on a mortgage of less than five years.  Plaintiffs are entitled to rescind the transaction and an award of damages, attorneys fees and costs for violations of TILA and HOEPA.

The late charge of $10 per day for payments more than five days overdue exceeds the maximum of 5% and the minimum of fifteen days allowed by the New Jersey Home Ownership Security Act of 2002, N.J. STAT. ANN. § 46:10B-22, *et seq.*  Plaintiffs are entitled to statutory damages equal to the finance charges plus 10% of the amount financed as well as costs and attorneys' fees.

Cleveland breached his promise to pay up to $46,000 to complete the O'Briens' chapter 13 plan.  Plaintiffs will be awarded a judgment for damages of $46,000 plus prejudgment interest.

Defendant, Gahwyler, as an attorney at law licensed in New Jersey, should have refused to participate in a fraudulent, unconscionable transaction.  He should not have prepared a HUD closing statement that grossly overstated the purchase price, falsely showed Cleveland investing significant cash in the deal, and falsely stated that the O'Briens were to receive substantial cash proceeds.  He conspired with Cleveland to commit fraud and violations of CFA, TILA, HOEPA, and HOSA.  He is jointly liable for the damages, costs and fees assessed against Cleveland.

Plaintiffs may submit proof of their attorneys' fees and costs.  Defendants will have an opportunity to object to the reasonableness thereof.  The court will schedule a further hearing on punitive damages.

A judgment finding no cause of action for conversion or breach of fiduciary duty will be entered in favor of Defendants, Cleveland and Gahwyler.  A judgment of no cause on all counts will be entered in favor of Defendant Cleveland Development, LLC.

**Dated: January 22, 2010**                             _____/s/ *Raymond T. Lyons*_____
                                                                   **Raymond T. Lyons**
                                                                   **United States Bankruptcy Judge**